The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hedrick and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. On 26 May 1991, Mr. Ashley and defendants were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between Mr. Ashley and defendant-employer.
3. On 26 May 1991, Mr. Ashley sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
4. Mr. Ashley died by suicide on or about 11 September 1991.
5. Three pages of Mr. Ashley's medical records from Dr. Fleury are admitted into evidence.
6. Seventeen pages of Mr. Ashley's medical records from Dr. Betts are admitted into evidence.
7. Eleven pages of Mr. Ashley's medical records from Dr. Weller are admitted into evidence.
8. One hundred forty-four pages of Mr. Ashley's medical records from Moore Regional Hospital are admitted into evidence.
9. Eight pages of documentation from ATT Family Credit Union are admitted into evidence.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. On 26 May 1991, Charles Ashley, the decedent, was employed by defendant-employer. On that date, Mr. Ashley was working as a linemaster, a position he was occupying temporarily in the absence of the individual who held that position permanently. Mr. Ashley had occupied the linemaster position for approximately six months.
2. On 26 May 1991, Mr. Ashley was operating a motorized Cushman cart within defendant-employer's plant. While operating the cart, Mr. Ashley collided with a steel column. The force of the collision threw Mr. Ashley from the cart and onto the floor, at some point bumping his head. When he stood up from the floor, he was laughing. He then returned to the Cushman cart and proceeded on his way. Mr. Ashley did not sustain any visible injuries and did not lose consciousness.
3. Three days later, Mr. Ashley presented to the Wesley Long Community Hospital emergency room, where he reported that he felt as though he was having a nervous breakdown. While in the emergency room, Mr. Ashley was hyperventilating and at times, crying. He stated that he was under stress at work and at home and that he had not been sleeping well. He described the incident involving the Cushman cart. Mr. Ashley left the emergency room before his examination had been completed.
4. Thereafter, Mr. Ashley returned to work for defendant-employer until 11 June 1991, when he presented to the High Point Regional Hospital emergency room. He reported that he had a "possible kidney stone" and complained of back pain and difficulty urinating. He described the incident on 26 May 1991, stated that he had experienced back problems since that time, but denied having headaches or blurred vision after that incident.
5. After the incident on 26 May 1991, Mr. Argersinger, Mr. Ashley's new supervisor, became concerned about Mr. Ashley's erratic behavior and recommended that he seek psychiatric treatment. Mr. Argersinger had not worked with or supervised Mr. Ashley for at least three years prior to the incident on 26 May 1991.
6. On 28 June 1991, Mr. Ashley presented to Moore Regional Hospital accompanied by a co-worker or a representative of defendant-employer's Employee Assistance Program. Mr. Ashley reported that he had experienced behavioral and emotional changes since the incident on 26 May 1991. He also stated that he was afraid that he would harm himself or someone else. On that date, Mr. Ashley was admitted to the hospital for psychiatric evaluation and treatment. During his admission, Mr. Ashley continued to exhibit bizarre, angry or inappropriate behaviors. He was discharged on 16 July 1991.
7. After his discharge, Mr. Ashley returned to work for defendant-employer in his usual position as a machine operator rather than his temporary linemaster position. After returning to work, Mr. Ashley continued to behave abnormally, exhibiting symptoms of depression which he ascribed to his medication. On one occasion after his hospitalization, Mr. Ashley laid on his back on the plant floor and stared at the ceiling. On another occasion, he undertook to wash the plant's windows. Mr. Ashley was not directed to wash the windows and window washing was not among his usual work duties.
8. At some time after the incident on 26 May 1991, Mr. Ashley purchased a 1969 Roadrunner automobile which cost approximately $10,000.00. Mr. Ashley did not characteristically make such purchases. To purchase the automobile, Mr. Ashley applied for a home equity loan. Mr. Ashley applied for the loan prior to 26 May 1991.
9. After returning to work, Mr. Ashley occasionally demonstrated his physical strength to co-workers. He once demonstrated how he could hold a twenty pound wrench at arms length for an extended period of time. On another occasion he demonstrated his strength by lifting a barrel that weighed over one hundred pounds.
10. Mr. Ashley continued working for defendant-employer until his death by a self-inflicted gunshot wound on 11 September 1991.
11. For approximately ten years prior to May 1991, Mr. Ashley and Ms. Marie Kidd had enjoyed a dating relationship. Their relationship began while the two were separated from their respective spouses. During their relationship, the couple experienced occasional break-ups or separations. Prior to 1991, Mr. Ashley was a shy, soft spoken, even-tempered individual.
12. Beginning in February or March 1991, Mr. Ashley began exhibiting behaviors that were unusual or different from the behaviors he exhibited during the preceding ten years. During this same period, Mr. Ashley and Ms. Kidd terminated their relationship.
13. Prior to May 1991, Mr. Ashley began operating motor vehicles in a reckless manner. Ms. Kidd was afraid to ride in an automobile with Mr. Ashley due to the recklessness of his driving. He had also began operating the Cushman cart recklessly prior to the incident on 26 May 1991.
14. Before ending their relationship, Mr. Ashley and Ms. Kidd went to a restaurant for dinner. Upon observing that their table had not been cleaned, Mr. Ashley loudly stated he would clean the table himself and then proceeded to do so. Prior to his hospitalization, Ms. Kidd went to visit Mr. Ashley at his home. During the visit, Mr. Ashley sat for eight hours before he would speak to Ms. Kidd.
15. Prior to May 1991, Mr. Ashley began boasting of and demonstrating his physical abilities. He also boasted of his abilities as linemaster. Occasionally, he would stay awake all night, even on nights when he was scheduled to work the following day. At times, he boasted to co-workers about his ability to stay awake all night and work the following day. He also mentioned to his co-workers that he was able to work an entire twelve hour shift without taking scheduled breaks, and without the need to use the men's room. In general, Mr. Ashley became insistent upon proving himself to be the best linemaster employed by defendant-employer.
16. Mr. Ashley also began to exhibit a lack of control over his temper, exhibiting anger that was disproportionate to the inciting event. On two of the occasions when Mr. Ashley's temper flared, his co-workers were the object of his anger and he cursed them in an audible voice. On another occasion, Mr. Ashley broke a broom handle across his knee.
17. During this same period, Mr. Ashley began spending large amounts of money purchasing NASCAR collectibles. Mr. Ashley did not characteristically make such purchases. Mr. Ashley later gave away many of the NASCAR collectibles.
18. Mr. Ashley's behavior began to change during February and March 1991. His behavior after the incident on 26 May 1991 was not qualitatively different from his behavior prior to that incident.
19. Mr. Ashley's changed behavior was caused by bipolar affective disorder. Mr. Ashley's bipolar affective disorder was not caused or significantly aggravated by the incident on 26 May 1991. Mr. Ashley committed suicide as a result of his bipolar affective disorder.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 26 May 1991, Charles Ashley sustained an injury by accident arising out of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Mr. Ashley's injury on 26 May 1991 was not a proximate cause of his death. N.C. Gen. Stat. § 97-38
3. Plaintiff is entitled to no death benefits under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-38.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each party shall bear its own costs of this appeal.
This is the 18th day of February, 1998.
 S/ _______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _____________________ J. HOWARD BUNN, JR. CHAIRMAN
DISSENTING:
S/ _____________________ BERNADINE S. BALLANCE COMMISSIONER